## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALYSSIA GLAGOLA, | ) | |
| | ) | |
| | ) | 2:22-cv-1263-NR-LPL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WALTER MACFANN, an individual; | ) | |
| TRI-COUNTY REALTY | ) | |
| ASSOCIATES, L.P., a Pennsylvania | ) | |
| Limited Partnership; and AMW | ) | |
| CONSULTING, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DECLINING TO ADOPT
## REPORT & RECOMMENDATION (ECF 28)

Before the Court is the Magistrate Judge's Report and Recommendation (ECF 28), recommending that the Court grant Defendants' Motion to Dismiss (ECF 24). Specifically, the Magistrate Judge recommends that Plaintiff Alyssia Glagola's "two Federal statutory causes of action be dismissed with prejudice for failure to state a claim as a matter of law and that the Court decline to exercise supplemental (here pendent) jurisdiction over the State law claims asserted." ECF 28, p. 1. Ms. Glagola filed timely objections to the R&R, arguing that she adequately stated her federal statutory claims, and thus the Court has subject-matter jurisdiction over her entire action. ECF 29.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must now review *de novo* the R&R. The Court may then accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. *See United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("[I]n providing for a 'de novo determination' … Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial

discretion, chose to place on a magistrate's proposed findings and recommendations." (cleaned up)).

After carefully considering the record, the Court sustains Ms. Glagola's objections, declines to adopt the R&R, and denies Defendants' motion to dismiss, as to the federal-law claims. Because Ms. Glagola has stated claims under federal law, the Court has supplemental jurisdiction over her state-law claims.

## BACKGROUND

After Ms. Glagola broke up with her boyfriend, she had little money and nowhere to go. ECF 11, ¶ 1. Then she met Walter MacFann while "on the hunt for a place to live." *Id.* ¶ 13. Mr. MacFann was "a local real estate agent and investor." *Id.* ¶ 2. Mr. MacFann "leased a home to [Ms.] Glagola at 13 Glad Street in Daisytown, Pennsylvania," but "unlike most landlords, [Mr.] MacFann did not want rent, he wanted sex." *Id.*

Ms. Glagola "signed a lease identifying Tri-County Realty Associates, L.P. as her 'landlord.'" *Id.* ¶ 19. Co-Defendant AMW Consulting LLC is Tri-County's general partner. *Id.* Initially, Mr. MacFann allowed Ms. Glagola to live at the house without paying full rent in exchange for cleaning services. *Id.* ¶ 18. After that first month, though, Mr. MacFann told Ms. Glagola that he would now only pay her rent in exchange for sex. *Id.* ¶ 20. According to Ms. Glagola, "[h]aving nowhere else to go and feeling like she had no choice if she wanted to protect and provide for her son, [she] acquiesced." *Id.* ¶ 21.

But Mr. MacFann did more than just demand sex from Ms. Glagola. *Id.* ¶ 24. He "threatened her with homelessness if she stopped having sex with him." *Id.* ¶ 25. He "got angry with her when he suspected she'd had male visitors or gone on dates"—even texting Ms. Glagola a photo of her driveway when someone other than Ms. Glagola had parked a car there. *Id.* ¶ 26. He was "physically abusive with [Ms.] Glagola, threatening her with a screwdriver on one occasion and grabbing and pulling

her by her clothes on another." *Id.* ¶ 27. He sent her unwanted sexual messages, including pornographic images. *Id.* ¶ 28. He also "came over unannounced, including late at night, and let himself into [Ms.] Glagola's home without notice or permission." *Id.* ¶ 29.

Ms. Glagola tried to end the relationship at various points but didn't have the necessary resources to follow through. *Id.* ¶ 30. Plus, Mr. MacFann told Ms. Glagola that "he had everyone 'in his pocket,' which [Ms.] Glagola took to be a reference to his relationships with local politicians, law enforcement, and the business community." *Id.* ¶ 31.

This ordeal caused great stress to Ms. Glagola, for which she had to seek professional treatment. *Id.* ¶ 32. Eventually, after receiving this treatment, she "was able to break off the sexual relationship with [Mr.] MacFann and leave the property." *Id.* ¶ 33.

From these core allegations, Ms. Glagola brings a litany of claims under both federal and state law. For her federal claims, she alleges that Defendants violated the Fair Housing Act, 42 U.S.C. § 3613, and the Trafficking Victims Protection Act, 18 U.S.C. § 1595.

## <u>DISCUSSION & ANALYSIS</u>[1]

### I.   **Ms. Glagola has stated claims under the Fair Housing Act.**

Ms. Glagola asserts three claims under the FHA: *quid pro quo* sexual harassment, hostile environment sexual harassment, and discriminatory statements.

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Any reasonable inferences should be considered in the light most favorable to the plaintiff. *Lula v. Network Appliance*, 255 F. App'x 610, 611 (3d Cir. 2007) (citing *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989)).

ECF 11.  According to the R&R, the first two claims fail because Ms. Glagola "does not allege that [her lease] terms (*e.g.*, rental due to [Tri-County]) were different or changed, or that leasehold services (*e.g.*, necessary repairs) were refused, or that her leasehold was withheld/revoked (*e.g.*, by action for retaliatory eviction) in consequence of [Mr.] MacFann's sexual harassment."  ECF 28, p. 6.  The Magistrate Judge also concluded, in a footnote, that the amended complaint "makes no allegation of discriminatory statements made (nor any indication of a preference/dispreference toward a protected group) with respect to/by one engaged in the rental of a dwelling[.]"  *Id.* at 5 n.6.  The Court respectfully disagrees on both points; all three claims survive.

### A.    Ms. Glagola has stated a claim for *quid pro quo* sexual harassment.

*Quid pro quo* sexual harassment is "an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to, among others, the rental or availability of a dwelling or the terms, conditions, or privileges of the sale or rental."  *Fox v. Gaines*, No. 19-81620, 2022 WL 1746812, at *3 (S.D. Fla. May 31, 2022) (citation omitted).  The Magistrate Judge concluded that the amended complaint "neither alleges nor suggests that the availability of [Ms. Glagola's] lease with [Tri-County] nor its terms or provision of services were conditioned on, or severely or pervasively adversely affected/influenced by (related to), [Mr.] MacFann's improper conduct[.]"  ECF 28, p. 5.  Instead, the Magistrate Judge found that the "coercive power of [Mr.] MacFann's alleged demands derived from his ability and threats to stop personally 'paying [Ms. Glagola's] rent in exchange for sex.'"  *Id.* (cleaned up).  This Court finds that, drawing all favorable inferences in Ms. Glagola's favor, the amended complaint alleges a textbook example of *quid pro quo* harassment.

The core allegation in the amended complaint is that Mr. MacFann—Ms. Glagola's landlord—offered to waive or pay for Ms. Glagola's rent in exchange for sex. ECF 11, ¶ 2.  So, submission to the unwelcome demand—*i.e.*, a request for sex—was made a condition to the terms of her lease—*i.e.,* free rent.  That is enough to state a claim for *quid pro quo* harassment.  *Krueger v. Cuomo*, 115 F.3d 487, 489-92 (7th Cir. 1997) (affirming *quid pro quo* finding where landlord requested that female tenant "fool around" to make up rent shortfall).

The Magistrate Judge reached the opposite conclusion by rejecting Ms. Glagola's allegation that Mr. MacFann was her landlord and focusing on the semantics of the offer.  ECF 28, pp. 2-6.  According to the R&R, Mr. MacFann, acting independently, and only offered to pay Tri-County for Ms. Glagola's rent if she submitted to his demands.  *Id.* at 5.  Thus, whether Mr. MacFann paid Ms. Glagola's rent would not change the rent charged by the actual landlord, Tri-County.  *Id.* at 6. This conclusion is at odds with the allegations in the amended complaint.

That is, Ms. Glagola expressly pled that Mr. MacFann was her landlord.  *See* ECF 11, ¶ 2.  The Magistrate Judge found that that assertion was "unsupported" and "contradicted" by Ms. Glagola's lease.  *Id.* at 2 n.4.  But that requires the Court to improperly draw an inference *__against__* Ms. Glagola, which it cannot do at this stage. For example, the Court would have to infer that Mr. MacFann did not have some relationship to Tri-County that would make him, in fact, Ms. Glagola's landlord, which would be contrary to what she expressly pled in the amended complaint.  It would also be contrary to reasonable inferences drawn from the allegations.  The core allegations in the complaint make clear that Mr. MacFann was the landlord or some type of director of Tri-Century, given his complete authority to allow Ms. Glagola to reside at the property without paying any rent, and later threatening to evict her. *See* ECF 11, ¶¶ 18, 25.  Mr. MacFann's precise role in leasing the house to Ms. Glagola and his relationship with Tri-County is a subject to be explored in discovery and

resolved on summary judgment or at trial, not definitively decided at this preliminary stage, especially since Ms. Glagola unambiguously pled that Mr. McFann was, in fact, her landlord.[2]

With that issue resolved, the form of Mr. MacFann's offer about Ms. Glagola's rent is irrelevant.  As her landlord, whether he is "waiving" her rent or "paying" it to himself directly or through Tri-County, the outcome is the same—Ms. Glagola doesn't have to pay rent to live in the house.  Indeed, the amended complaint uses this terminology interchangeably.  In one paragraph, Ms. Glagola alleges that her tenancy began with Mr. MacFann waiving her rent in exchange for cleaning services (*id.* ¶ 18), and then later alleges that Mr. MacFann offered to "pay" her rent in exchange for sex (*id.* ¶ 20).  The key inference from these allegations is that Mr. MacFann, as Ms. Glagola's landlord, could unilaterally change the conditions and terms of her lease, if she yielded to his demand for sex.  And that is enough to plead a claim for *quid pro quo* harassment.

### B.     Ms. Glagola has adequately pled a hostile housing environment claim.

Hostile housing environment sexual harassment is "understood as unwelcome conduct that is sufficiently severe or pervasive as to interfere with: the availability, sale, rental, or use or enjoyment of a dwelling; or the terms, conditions, or privileges of the sale or rental." *Noah v. Assor*, 379 F. Supp. 3d 1284, 1290 (S.D. Fla. 2019) (cleaned up).  This disjunctive means that a hostile environment claim "***does not*** require a change in the economic benefits, terms, or conditions of the dwelling"; interference with the tenant's use or enjoyment of a dwelling is enough on its own.

---

[2] Even if the Court were inclined to draw such an inference, at a minimum, the Court would grant Ms. Glagola leave to amend to "allege[] that MacFann is a part-owner of Tri-County" and "was in total control," as she suggests she could in her objections to the R&R.  ECF 29, p. 6.  The Court does not find that such an amendment is necessary to state a claim.

Case 2:22-cv-01263-NR   Document 32   Filed 11/03/23   Page 7 of 12


*Id.* (cleaned up); *see also Fox,* 2022 WL 1746812, at *4 (to state a claim, a plaintiff need only establish that defendant's "behavior and sexual conduct was unwelcome and sufficiently pervasive as to interfere with Plaintiff's use and enjoyment of her apartment"). This harassment can "be written, verbal, or other conduct, *and does not require physical contact.*" *Noah*, 379 F. Supp. 3d at 1290 (quoting 24 C.F.R. § 100.600) (emphasis in original).

Considering these requirements, this Court respectfully disagrees with the Magistrate Judge's reason for dismissing this claim (*i.e.*, that the amended complaint "neither alleges nor suggests that the availability of [Ms. Glagola's] lease with [Tri-County] nor its terms or provision of services were conditioned on, or severely or pervasively adversely affected/influenced by (related to), [Mr.] MacFann's improper conduct"). ECF 28, p. 5.

Importantly, the Court must "look to the totality of the circumstances, which includes but is not limited to, the nature of the conduct, the context in which the incidents occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved" to determine whether these circumstances diminished Ms. Glagola's use or enjoyment of her house. *Noah*, 379 F. Supp. 3d at 1290 (cleaned up). And the totality of the circumstances alleged in the amended complaint are enough to support her hostile housing environment claim.

Ms. Glagola details "harassing conduct, such as sexual propositions, multiple physical trespasses, stalking related behavior, sexually lewd comments, and repeated expressions of jealousy." *Id.* at 1291. The relevant allegations break down as follows:

| | |
|---|---|
| Unwelcome sexual propositions | "[Mr.] MacFann asked for sex instead, explaining that he would pay [Ms.] Glagola's rent in exchange for sex." ECF 11, ¶ 20. |

| | He sent her "unwanted sexual messages, including physical comments about her body" and pornographic images.  *Id.* ¶ 28. |
|---|---|
| Stalking-related behavior | Mr. MacFann "got angry with her when he suspected she'd had male visitors or gone on dates," and "even texted [her] a photo of her driveway when someone other than [Ms.] Glagola had a car parked there."  *Id.* ¶ 26. |
| Physical trespasses | He "threaten[ed] her with a screwdriver" and "grabb[ed] and pull[ed] her by her clothes."  *Id.* ¶ 27. |
| | He "came over unannounced, including late at night, and let himself into [Ms.] Glagola's home without notice or permission."  *Id.* ¶ 29. |

These allegations, taken together, are sufficient to state a claim.  *See, e.g.*, *Noah*, 379 F. Supp. 3d at 1293 ("In short, looking at the totality of the circumstances, and taking Plaintiff's allegations as true as the Court must, the Court finds Plaintiff sufficiently pleads that Defendant's alleged conduct—*i.e.*, the sexual propositions followed by completed threats, the physical trespasses into her home, the stalking, the sexually lewd comments, and the repeated expressions of jealousy—amounts to both *quid pro quo* and hostile environment sexual harassment[.]" (cleaned up)); *Krueger*, 115 F.3d at 490-92 (affirming finding that defendant interfered with plaintiff's quiet enjoyment where defendant made unwanted sexual advances); *West v. DJ Mortg., LLC*, 164 F. Supp. 3d, 1393, 1399 (N.D. Ga. 2016) (denying motion to dismiss hostile environment sexual harassment claim where plaintiff alleged defendant made unwelcome sexual advances toward plaintiff and asked plaintiff for sexual pictures, in connection with performing home repairs); *Salisbury v. Hickman*, 974 F. Supp. 2d 1282,1292 (E.D. Cal. 2013) (denying a motion for summary judgment on plaintiff's

sexual harassment claim because defendant accosted plaintiff several times and explained that he had "urges" for her).

> **C.    Ms. Glagola has adequately pled a claim for discriminatory statements.**

The FHA makes it unlawful to "make, print, or publish … any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination" based on sex.   42 U.S.C. § 3604(c).  This prohibition extends to oral statements.  24 C.F.R. § 100.75(b).  "This claim can be established by showing that the statement communicates discrimination in an obvious or undeniable way to an ordinary reader, or that it is discriminatory through proof of extrinsic circumstances demonstrating discriminatory intent." *Torres v. Rothstein*, No. 19-594, 2020 WL 7696084, at *4 (D. Nev. Dec. 26, 2020) (cleaned up).  "A plaintiff can demonstrate discrimination under this subsection by showing the statement contains sexual harassment."  *Id.* (citing 24 C.F.R. § 100.600(a)).

In a footnote, the Magistrate Judge concluded that "[a]lthough Plaintiff's Response in Opposition also asserts liability under the FHA's provisions against discriminatory statements under Section 3604(c), the Amended Complaint makes no allegation of discriminatory statements made (nor any indication of a preference/dispreference toward a protected group) with respect to/by one engaged in the rental of a dwelling as contemplated by the Act."  ECF 28, p. 5 n.6.  The Court, respectfully, disagrees. Ms. Glagola alleges that Mr. MacFann made many sexually harassing statements.  ECF 11, ¶¶ 20, 25, 26, 28, 30, 31.  Mr. MacFann made those statements in connection with Ms. Glagola's lease and an ordinary listener could find that they amounted to discrimination based on her sex.  *Torres*, 2020 WL 7696084, at *4; *Richards v. Bono*, No. 04-484, 2005 WL 1065141, at *7 (M.D. Fla. May 2, 2005) ("The complaint alleges that Mr. Bono told the Plaintiff that she would be evicted if

she did not keep quiet about his sexually hostile behavior.  This is sufficient to allege that Mr. Bono orally expressed that submission to his sexual advances was a condition of continued occupancy.").

## II. Ms. Glagola has stated claims under the Trafficking Victims Protection Act.

Ms. Glagola brings two claims under the TVPA: one for "forced labor," under 18 U.S.C. § 1589, and one for "sex trafficking," under 18 U.S.C. § 1591.  ECF 11, ¶ 41. The Magistrate Judge recommends that the Court dismiss both claims, with prejudice, because the reach of these statutory provisions is not "so broad as to extend to the 'rent payment in exchange for sex' nature of the individual parties' transactions/relationship (whether such funds were paid by [Mr.] MacFann directly to [Ms. Glagola] or to the rent due on her housing lease with TCRA)."  ECF 28, pp. 6-7.  The Court finds that reading of the statute to be too narrow, and that Ms. Glagola has adequately stated both claims in her complaint.

### A. Ms. Glagola has stated a claim for forced labor.

"Generally speaking, the [TVPA] establishes criminal and civil penalties against forcing a person, by deploying certain prohibited tactics, to perform labor or services."  *Richardson v. Nw. Univ.*, No. 21-522, 2023 WL 6197447, at *4 (N.D. Ill. Sept. 21, 2023).  The prohibited tactics include "force, serious harm, abuse of law, or threats of any of those things."  *Id.* (citations omitted).  "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. 1589(c)(2).  A threat of serious of harm can be accomplished by "means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or

another person would suffer[.]" 18 U.S.C. § 1589(a)(4). "Labor or services in § 1589 is not limited to work in an economic sense and extends to forced sexual acts." *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (cleaned up).

Ms. Glagola alleges that Mr. MacFann violated Section 1589 in several ways. He threatened her and her son with homelessness, a serious harm. ECF 11, ¶¶ 25, 28. With her home at stake, a reasonable person in Ms. Glagola's shoes might feel compelled to continue providing sex to Mr. MacFann. *See Bistline v. Parker*, 918 F.3d 849, 871-72 (10th Cir. 2019) (finding that "loss of a place to live" is a serious harm). "At the very, very least, the [amended complaint] sufficiently alleges that [Mr. MacFann] used a scheme or plan intended to cause [Ms. Glagola] to *believe* (even if in fact it would not happen) that she would suffer serious harm if she did not perform the [sexual] services." *Richardson*, 2023 WL 6197447, at *6 (finding that cheerleader adequately alleged a forced labor claim where she alleged that she was coerced into attending alumni events at which she was groped and touched through threats that she'd have to pay back her scholarship).

But that's not all that Ms. Glagola has alleged to trigger the statute. Recall that she also claims that Mr. MacFann "grab[bed] and pull[ed] her by her clothes" and "threaten[ed] her with a screwdriver"—in other words, he used actual and threatened force to get her to perform sex. ECF 11, ¶ 27. And he consistently preyed upon her housing vulnerability to coerce her into having sex with him, which amounts to a scheme or pattern. *Id.* ¶¶ 11-34. The amended complaint thus meets the pleading requirement for a forced labor claim in several ways.

Defendants argue that Ms. Glagola's claim fails because she failed to allege "physical or psychological confinement approaching enslavement." ECF 31, p. 8. But that isn't required by the statute, which "encompasses a broad range of conduct." *Burrell v. Staff*, 60 F.4th 25, 37 (3d Cir. 2023). "[A]ppalling criminal conduct and shocking depravity" are not necessary. *Id.* Rather, the TVPA was intended to capture

"the increasingly subtle ways by which labor may be forced, including both physical and nonphysical forms of coercion." *Id.* (cleaned up).  And because of that, it captures the conduct alleged here.

> **B.**    **Ms. Glagola has stated a claim for sex trafficking under the TVPA.**

Ms. Glagola has also stated a claim for sex trafficking under the TVPA.  In the context of the statute, sex trafficking is broader than how a lay person might envision the concept.  Section 1591(a) "targets commercial sex activity that is forced or coerced; it does not address commercial sex activity generally." *Doe 1 v. Red Roof Inns, Inc.*, No. 19-3840, 2020 WL 1872335, at *3 (N.D. Ga. Apr. 13, 2020) (citation omitted). There's no doubt that performing sex for money (or a rent waiver) is a commercial sex act.  The TVPA also requires that "means of force, threats of force, fraud, or coercion caused the commercial sex act." *Richardson*, 2023 WL 6197447, at *7 (cleaned up). "Given the similarity between the forced-labor definition and the sex-trafficking definition, the analysis and the answer [to that second issue] are the same." *Id.*  For the reasons outlined earlier, the amended complaint pleads sufficient threats of force and coercion.

*     *     *

**AND NOW**, this **3rd day of November, 2023**, the Court sustains Ms. Glagola's objections (ECF 29), and declines to adopt the R&R (ECF 28) as the opinion of the Court.  Instead, for the reasons discussed above, Defendants' motion to dismiss (ECF 24) is **DENIED**.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge